IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNION FIDELITY LIFE INSURANCE CO., | ) |
| Plaintiff, | ) ) |
| | ) No. 10-cv-5836 |
| v. | ) ) |
| | ) Judge Sharon Johnson Coleman |
| WELLS FARGO INSURANCE, INC., | ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Union Fidelity Life Insurance Company and defendant Wells Fargo Insurance were parties to a series of agreements that allowed Union Fidelity to market various forms of insurance to different segments of Wells Fargo's financial customer base. Although the agreements have expired, Union Fidelity claims that Wells Fargo has violated their surviving restrictions and state trade secret laws by efforts to sell competing insurance products to the Union Fidelity/Wells Fargo customers. In the motion at issue here, Union Fidelity seeks a temporary restraining order and a preliminary injunction prohibiting further Wells Fargo marketing to these customers pending ultimate resolution of its claims. The court finds that Union Fidelity has presented sufficient evidence to justify relief under the 2001 and 2004 agreements, and grants the motion as to certain solicitations of customers under those agreements. Union Fidelity's motion is otherwise denied.

**<u>Background</u>**

The parties do not dispute the circumstances surrounding the creation of their relationship. In January 1997, Union Fidelity and Wells Fargo's predecessor, Norwest Insurance, entered into a "Service Agreement" that allowed Union Fidelity to market various forms of insurance to Norwest's mortgage loan customers. After Norwest gave Union Fidelity a list of its customers, Union Fidelity decided which of those customers to solicit, controlled the method of solicitation, signed interested customers to insurance policies, and handled policy service and claims. Union Fidelity identified its insurance buyers for Norwest, Norwest collected premium payments through its preexisting relationships with the customers, premium payments were redirected to Union Fidelity, and Norwest kept a fee for the billing service. The agreement extended for a base period of three years; following the base period, it automatically extended for new one-year terms unless either party sent the other a written notice of cancellation sixty days before the end of the current term.

In November 1997, Union Fidelity and Norwest extended their arrangement to a new group of Norwest's customers: they executed another contract that permitted insurance sales to Norwest's credit card customers on terms virtually identical to those governing the earlier agreement for mortgage customers. The parties entered into a third similar contract for Norwest's checking account customers in October 1998.

Norwest merged with the parent company of Wells Fargo Insurance in November 1998, and Wells Fargo assumed the Norwest interests in the Union Fidelity contracts. In 2001, Union Fidelity and Wells Fargo executed a contract for the marketing and sale of additional insurance products to Wells Fargo checking account customers. This contract created rights and obligations similar to those established by the three earlier agreements, but was different in form

and language from its predecessors.  Union Fidelity and Wells Fargo entered into the last of the service agreements in December 2004, again using a slightly different contract form to extend their prior partnership to the marketing of different insurance policies to new Wells Fargo customers.

The 1997, 1998 and 2001 agreements included provisions that purported to govern ownership of confidential information.  In addition to the service agreements, Union Fidelity and Wells Fargo also signed a "Master Confidentiality and Non-Disclosure Agreement" in 2002.  This agreement was expressly intended to supplement the obligations of the 1997-2001 service agreements, whose continued validity was acknowledged by the parties.  The 2004 service agreement, unlike its predecessors, provided that the parties' confidentiality obligations would be governed by the master agreement, and the parties re-executed the confidentiality agreement at the time of their signing of the 2004 service agreement.

All of the agreements remained in force until they were terminated by mutual agreement of the parties, effective January 31, 2005.  Wells Fargo continued to serve as the billing agent for its customers who held active Union Fidelity insurance policies, and it continued to remit customer premium payments to Union Fidelity after retaining a portion of the customer's payment as fee for the billing service.

In August 2010, Wells Fargo informed Union Fidelity that some of the parties' mutual customers would be offered insurance with a new carrier, Minnesota Life.  Wells Fargo also advised Union Fidelity that mortgage customers who had purchased insurance pursuant to the 2004 agreement would continue to have their premiums collected by Wells Fargo, but that those premiums would be sent to Minnesota Life instead of Union Fidelity.  The parties exchanged

communications on the propriety of Wells Fargo's plans, were unable to reach agreement, and Union Fidelity brought this suit.

### Union Fidelity's Claims

Union Fidelity alleges that upon receipt of lists of Norwest and Wells Fargo customers who were potential targets for insurance solicitation, it performed costly proprietary analysis to determine which customers to approach. Union Fidelity does not allege that Wells Fargo has somehow misappropriated this proprietary analysis. It instead claims that the resulting lists of customers who actually purchased its insurance are trade secrets, and that Wells Fargo's proposed use of the insurance customer lists violates the confidentiality provisions of the marketing and Master Confidentiality agreements as well as trade secret laws of Illinois, Pennsylvania and Wisconsin. Union Fidelity seeks a declaratory judgment that Wells Fargo is not entitled to use the list to solicit policyholders to cancel their Union Fidelity policies or to purchase other insurance. It seeks injunctive relief to prohibit Wells Fargo from using the lists for those purposes, and from using or disclosing the lists for any purpose other than to perform its obligations under the marketing agreements. Since the provisions of the various contracts differ, assessment of Union Fidelity's claims requires analysis of the provisions of the individual agreements.

### The 1997 and 1998 Agreements

The earliest agreements referenced by Union Fidelity's complaint are its November 1997 and October 1998 agreements with Norwest. The complaint does not refer to the January 1997 agreement. All of the Union Fidelity - Norwest agreements contain similar terms and are governed by Pennsylvania law.

Pennsylvania jurisprudence provides that unambiguous contract terms are to be interpreted by the court as a matter of law. *Trizechahn Gateway LLC v. Titus,* 601 Pa. 637, 653 (2009). The contract terms governing Union Fidelity's claims of trade secret protection for its policyholder lists are sufficiently clear to be interpreted by this court by reference to their plain language.

Section 6.2.b of the November 1997 Union Fidelity-Norwest service agreement defines "Confidential Information" to include "any information relating to Customers, ***including lists of insureds***, marketing strategies; methods of doing business; or any other related data supplied to Company by or through Agent or one of its affiliates." [Docket #1, Ex. A, p.7][emphasis added.] Section 6.2.b.2 of that agreement provides that "Confidential Information is owned by Agent (or its affiliates) and Agent (or its affiliates) will retain all ownership rights." That section further provides that "Company agrees to return any such Confidential Information owned by Agent to Agent, upon request." [Id.] The agreement's opening recital identifies Norwest as "Agent." [Docket #1, Ex. A, p. 2.] The service agreement thus establishes that lists of insureds are the property of Norwest.

The November 1997 service agreement also contemplates restrictions on Norwest's ability to solicit Union Fidelity customers with offers of other insurance. Section 6.4.b of the agreement provides that Norwest shall not allow customers insured as a result of the agreement to be targeted for replacement insurance coverage or solicited with offers of insurance similar to the policy issued by Union Fidelity. [Docket #1, Ex. A., p. 11.] However, this prohibition extends only for a period of three years "following the date the last mailing is executed under this Agreement." [Id.] Union Fidelity does not claim that this three year prohibition extended to

the 2010 time of Wells Fargo's new solicitation efforts.

The relevant terms of the October 1998 service agreement are virtually identical to the provisions described above. The 1998 agreement also defines "Confidential Information" to include "lists of insureds" and assigns ownership of such information to Norwest. Like its predecessor, the 1998 agreement contained solicitation prohibitions of limited duration, and Union Fidelity has not claimed that their operation extended to 2010.

Union Fidelity argues that Wells Fargo's planned uses of the lists of customers under the 1997 and 1998 agreements are prohibited by section 6.2..a of those agreements. This section required Norwest to keep confidential "information and materials including marketing and telemarketing techniques . . . and materials." [Docket #1, Ex. A, p. 9.] Union Fidelity does not allege that Wells Fargo threatens to use its marketing techniques or materials, and its argument is instead based on the presumption that the customer lists are included in the general category of "information and materials." But that description can be construed to include the customer lists only in a general sense, in contrast to the provision specifically assigning ownership of "lists of insureds" to Norwest, and specific provisions control contract interpretation under Pennsylvania law. *Kline v. Marianne Germantown Corp.,* 438 Pa. 41, 45 (1970). The plain language of the agreements thus establishes that the resulting lists of insured customers were owned by Norwest.

This court concludes that neither the November 1997 agreement nor the October 1998 agreement currently prohibits Wells Fargo, as successor in interest to Norwest, from using customer information received under those agreements to solicit Union Fidelity's insurance customers to induce them to buy policies from other carriers.

**The 2001 Agreement**

In November 2001, Wells Fargo Insurance Services and Union Fidelity entered into an agreement that allowed Union Fidelity to market its hospital accident insurance plan to checking account customers of Wells Fargo and its affiliates. This agreement is governed by Illinois law. Illinois law considers interpretation of contract provisions to be an issue to be determined by the court as a matter of law. *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill. 2d 281, 288 (1990).

Union Fidelity argues that under Section 12(j) of the 2001 agreement, the lists of its insured customers are "Confidential Information." That section provides in pertinent part:

> "In performing its obligations pursuant to this Agreement, each party may have access to and receive disclosure from the other of certain proprietary and confidential information, including, but not limited to, financial records, technological developments, marketing strategies, Customer Information, Policyholder lists, employee lists, and other information considered by the disclosing party to be confidential and proprietary ("Confidential Information").

Section 12(k) of the agreement limits each party's use of the other party's Confidential Information to acts necessary to fulfill its obligations under the agreement. Neither of the above provisions establishes ownership of the lists of insurance customers, but Union Fidelity claims that the insureds are its customers, that the lists were derived from its relationship with them, and that the lists are therefore its confidential information, which Wells Fargo was not permitted to

7

use for purposes unrelated to the agreement. Other provisions of the agreement contradict Union Fidelity's claim.

Section 12's preamble provides that "Customer Information" includes "all information or data provided by, through, or on behalf of [Wells Fargo]" or its affiliates to Union Fidelity "about or relating to individuals; their names, addresses, telephone numbers, or identifying information; their financial accounts, products, services, or affairs; their personal characteristics or preferences; or about or related to individuals in any manner whatsoever." Union Fidelity correctly contends that information it generates about purchasers of its policies cannot be considered "Customer Information" because such information was not provided by Wells Fargo to Union Fidelity. But the definition of "Customer Information" extends further, and includes "any and all information or data consisting of customer lists of individuals (however derived), marketing strategies pertaining to such individuals, and methods of doing business with respect to such individuals." Section 12(b) of the agreement provides that "All Customer Information obtained by or provided to [Union Fidelity] under this agreement is owned by [Wells Fargo] – and in no event by [Union Fidelity] . . . " Since "Customer Information" includes customer lists, however derived, and since Customer Information, whether obtained by or provided to Union Fidelity, is owned by Wells Fargo, the agreement squarely refutes Union Fidelity's claim of ownership of the lists of insureds.

However, the 2001 agreement imposes restrictions on Wells Fargo that are independent of the ownership of the customer lists. Section 10 of the agreement, entitled "Limited Dealings," provides:

> "Notwithstanding the termination of this Agreement, [Wells Fargo] will not offer or permit any third party to offer to any Customer enrolled in the Insurance Products under this Agreement any insurance program that provides coverage or benefits similar to or competitive with the Insurance Products during the duration of each such Customer's coverage under the Insurance Products."

Customers who have active Union Fidelity insurance policies produced by the 2001 agreement thus cannot be solicited by Wells Fargo with offers of similar insurance, and Wells Fargo cannot assist any third party in making any such solicitation.

**The 2002 Master Confidentiality Agreement and 2004 Marketing Agreement**

In 2002, Union Fidelity and Wells Fargo entered into a Master Confidentiality and Non-Disclosure Agreement. The confidentiality agreement acknowledged the continued effectiveness of the earlier marketing agreements and purported only "to supplement any existing obligation of the parties as set forth" in those agreements. The "Confidentiality" section of the 2004 marketing agreement between the parties states only that they agree to be bound by the Master Confidentiality Agreement.

The confidentiality agreement defines "Customer Information" to include "customer names and all other information related to current, former and future customers of a party or its affiliates," including any nonpublic personal information. Section 3(a) of the agreement provides that "Each party agrees not to use Confidential Information or Customer Information of the other party for any purpose other than the fulfillment of such party's obligations to the other party" under the marketing agreements. The section further provides that "Neither party shall

9

disclose, publish, release, transfer or otherwise make available Confidential Information or Customer Information of the other party in any form to, or for the use or benefit of, any person or entity without the other party's consent." The agreement does not designate either party as owner of any specific information.

Since the customers who purchased insurance from Union Fidelity as a result of the 2004 marketing agreement were initially customers of Wells Fargo, this court cannot conclude that their general identifying information, including the information that they are insurance customers, is the exclusive property of either party.  As a result, the court concludes that the confidentiality agreement and the 2004 marketing agreement do not prohibit Wells Fargo's use of customer identity information to solicit those who bought insurance from Union Fidelity as a result of the 2004 agreement.  This conclusion is consistent with the agreement's finite term of solicitation prohibition.  Section 10 of the 2004 agreement prohibits Wells Fargo solicitation of Union Fidelity customers for the term of the agreement and further prohibits the solicitation of any Union Fidelity purchaser for three years of the effective date of the customer's purchase of a policy, and the expiration of these restrictions suggests that such solicitation is permissible thereafter.

However, Union Fidelity has presented evidence that Wells Fargo contemplated more than the mere use of that general information to solicit Union Fidelity's insurance customers. Wells Fargo instead planned to take insurance premiums collected from its mortgage customers under Union Fidelity policies and to pay them to a new insurance carrier.  Such action would require Wells Fargo to use policy pricing and payment information it acquired only through its role as billing intermediary between Union Fidelity and the insurance buyers.  This pricing and

10

payment information is clearly the customer information of Union Fidelity that, according to the confidentiality agreement, should be used by Wells Fargo only to fulfill the billing agent role, not to enable a seamless shift of payments to a new insurer. The court finds that the confidentiality agreement prohibits the use of billing and payment information to redirect premiums to a new insurer.

## Illinois Trade Secrets Act

Union Fidelity also claims that it is entitled to relief under the Illinois Trade Secrets Act, 765 ILCS 1065/1 (West 2008). That statute prohibits misappropriation of trade secrets and allows injunctive relief for actual or threatened misappropriation. 765 ILCS 1065/3. The statute defines "misappropriation" of trade secrets as one person's unauthorized acquisition or use of the trade secret of another. 765 ILCS 1065/2. Since customer information generated under the 1997, 1998 and 2001 marketing agreements is owned by Wells Fargo, its use of that information cannot be construed as a misappropriation under the statute.

The restrictions imposed by the 2002 confidentiality agreement and the affidavit of Union Fidelity Direct Insurance Business Leader Kelvin Schill [Docket #1, Exhibit A] provide sufficient evidence that the billing, pricing and payment information generated under the 2004 marketing agreement is considered the trade secret of Union Fidelity under the statute. The injunctive relief remedy provided by the statute duplicates the equitable remedy sought by Union Fidelity as a result of Wells Fargo's threatened breach of its contractual obligations, and the court's analysis of the appropriate remedy applies to Union Fidelity's contractual and statutory claims.

**Injunctive Relief**

As an initial matter, this court assesses Union Fidelity's request for injunctive relief by determining whether there is a greater than negligible chance that its claims will succeed on the merits, and if those claims have no chance of prevailing, its injunction claim merits no further analysis. *Platinum Home Mortgage Corp. V. Platinum Financial Group, Inc.,* 149 F.3d 722, 730 (7th Cir. 1998). Since the court finds that information generated pursuant to the 1997 and 1998 agreements is owned by Wells Fargo, Union Fidelity has no reasonable chance of success on the merits of claims based on its assertion of ownership of that information, and its requests for injunctive relief regarding use of that information are denied.

As noted above, the court finds that Union Fidelity has a reasonable chance at success on the merits of its claim to prevent Wells Fargo's solicitation of customers who have active policies pursuant to the 2001 agreement. Union Fidelity also has a better than negligible chance of success on its claim to prevent redirection of 2004 agreement customer premiums to a new insurer.

The court next considers whether Union Fidelity has shown that in the absence of injunctive relief, it would suffer irreparable harm for which money damages would be an inadequate remedy. *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). Wells Fargo's insistence that its contemplated solicitations are permissible under the parties' agreements establishes that the events Union Fidelity seeks to enjoin would occur in the absence of an injunction.

The harm suffered by a business when its customers are solicited in violation of a contractual prohibition has been frequently held to be beyond remedy by an award of money

damages. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.,* 420 F. Supp. 2d 866, 872 (N.D.Ill. 2006). The court finds that solicitations from Wells Fargo in violation of the parties' agreements have the potential to cause harm to Union Fidelity's goodwill to a degree not readily measured by the mere loss of customers in the short term, and that this difficulty in assessing damages makes that remedy less than adequate compensation for any harm suffered.

This court must assess the balance between the merits of each party's position and the risk of harm that would result from an erroneous ruling against either party, and must also determine whether a grant or denial of injunctive relief would harm or serve the public interest. *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 831 (7th Cir. 2002). The evidence presented to the court of the impact of an injunction on Wells Fargo is insufficient to overcome the weight of Union Fidelity's likely success on its claims to enforce the restrictions of the 2001 and 2004 agreements. The sole public interest invoked by Wells Fargo in opposition to a grant of injunctive relief is an interest in favor of the enforcement of valid contracts, and in this court's view, that interest is served by a grant of relief under the two contracts noted.

## Conclusion

The court finds that Union Fidelity has presented sufficient evidence to establish its right to preliminary injunctive relief under the 2001 and 2004 agreements. Until further order of court:

1. Customers with active Union Fidelity insurance policies generated pursuant to the 2001 marketing agreement may not be solicited by Wells Fargo with offers of similar insurance and Wells Fargo may not assist any third party in any such solicitation;

2. Wells Fargo may not redirect premiums collected for Union Fidelity pursuant to the 2004 marketing agreement to another insurance provider.

June 1, 2011

So ordered.

_____
Sharon Johnson Coleman
District Judge